May it please the Court. Sean Herman for Appellant Plaintiff Abigail Wilson. We are here today because the District Court improperly granted summary judgment on Plaintiffs Title VII, ADA, FMLA, and North Carolina tort claims. Those tort claims include IIED, battery, and negligent retention and supervision. Your Honors, the District Court, in reaching its conclusion, this decision, relied heavily on the argued below disputed facts. It reached two broad overarching conclusions that colored that holding. The first is that prior to March 2012, the County, in this case, did not have sufficient notice of the underlying harassment to be held liable, which started months prior. The second conclusion is that the County, once receiving, assuming they did, you know, first time received it in March 2012, acted reasonably. Your Honors, Plaintiff Appellant submits that under the summary judgment standard, those conclusions are not possible. Now, that standard, and this Court has recently and repeatedly affirmed, you must view disputed facts in favor of the non-moving party. You must not weigh evidence or make credibility determinations. And you must consider all here. But when determining whether there is a disputed material fact, there is abundant case law that the Plaintiff cannot create that dispute by disputing its own testimony, right? Yes, Your Honor. I'm aware of that case law. And that, it seems to me, is what you've got to have to deal with here. Yes, Your Honor. And I will go ahead and address that argument because that's not what happened here. Ms. Wilson did not create disputed facts. The argument is that in her deposition, she testified about reporting this conduct to her supervisors. Also in her deposition that she affirmed under oath that she didn't do that. That's the argument. And so they're saying, well, that's inconsistent. That's not what happened. And I argue that precisely and specifically in the briefs. And the case law on that, the Halperin case, that's not what happened here. She did not contradict herself. We're talking about a few minutes apart in the same deposition where, first of all, when she's talking about not complaining. I mean, why, how do you say she didn't contradict herself? Because, you know, on the one hand, she says, well, I reported. And then on the other hand, she says, well, I had these, the reasons I didn't report were because I didn't want to get him in trouble. And, you know, that may or may not be true. I don't know whether, you know, that was just a pretextual reasons or what. But they do seem kind of at odds with one another. Sure, Your Honor. And the response to that is that when she's talking about complaining, which she clarifies in her statement, which the court didn't consider at all in its decision, she says, I was talking about human resources. She admits, she didn't. Let me ask you this. As far as a disputed issue of fact, it's not disputed that the company had a sexual harassment policy, is it? It's not, Your Honor. All right. It's not disputed that the company failed to circulate or make its employees aware of the policy? That's not disputed, Your Honor. Okay. It's not disputed, I think. Well, this may be, but it's not disputed that once the matter was reported through that channel, the company responded by removing the Mr. Schiff, and later on made clear that they weren't even going to come into contact with each other when they were switching vans. And so that, I think they gave Putnam a written warning and ordered counseling, too, didn't they? They did. So there's a huge part of this case dealing with the policy and the company's response when the actions was reported through the policy that's undisputed. And your responses have been straightforward and honest in that regard, and I appreciate it. But given the fact that the company has a policy and the policy, when utilized, actually resulted in remedial action, why isn't that the material issue of fact for Rule 56 purposes? Your Honor, there's a lot there. The first important distinction this Court can't overlook is that we're talking about co-worker harassment here. This is a co-worker harassment here. The District Court, when it applied the law and said, well, there was a policy, when she followed it, first of all... Well, you know, the co-worker harassment, I don't understand why that wouldn't cut against you, because the great majority of these incidents are co-worker incidents, and there's always some sort of slightly ambiguous situations, and they're he said, she said situations. And if you're going to hold a company, the supervisory harassment is a much more serious thing, I think, but the co-worker harassment is serious. But if you're going to hold a company liable under respondeat superior for all of the different instances of co-worker harassment, which unfortunately occur with unfortunate frequency, and the allegations occur with frequency, there's something that goes against the grain of due process to hold a company liable under respondeat superior principles when the company has devised a way of giving them notice, and they haven't even been given the notice. And the Supreme Court says, look, these policies are advantage of them, and we want companies to take remedial action when they're utilized. And it seems to me this comes close to saying, well, I don't know, that doesn't really matter. I mean, it doesn't seem right. Yes, Your Honor, in this case, one thing that is in dispute, their policy says you can report it to your supervisor, and they have a duty to elevate it. That's what she did. Now, it wasn't perfect. She didn't fill out the handwritten form. The case law doesn't say you have to be perfect. The case law is about whether the company is on notice or should have been and is negligent in dealing with it. I thought your theory of this case was that the company was on notice because of a prior incident involving harassment. That is well, Your Honor. Prior to Ms. Wilson even coming into contact with them for the first time, another employee had reported in detail to the supervisors what happened. And this incident is very similar to one detailed in the briefs about what happened to Ms. Wilson. He grabbed her by the sides after tickling her and punching her, and she's saying, stop, and tries to pull her out of a truck at work. She's pushing back. She's saying, stop it. He goes in for a kiss, and she punches him in the stomach to get him to stop. She reports that in detail before Ms. Wilson even comes in the picture. She comes in the picture about arguably a few weeks to a month later. They don't punish him at all, Your Honor. Even before that, he's written up for hostile work environment with the supervisor, the chief of the whole department in the meeting, 15-minute meeting for hostile work environment. Before that, when he's hired, he's fired from his first job, and that's not even gotten into. Ms. Wilson is reporting as early as November 2011. She does it again and over and over and over. It's laid out in the brief. She's detailed in her things, and, Your Honor, there is a dispute about what they knew when. One thing that was glossed over improperly by the trial court that I think is really important to touch on is after the HR investigation, this is the second conclusion, is that they acted reasonably even after all the due process stuff and they got the notice. Your Honor, within a month, they're interacting again and shift changes. He's ramming into her. He's calling her a bitch. Isn't the record replete with her testimony that she didn't report Mr. Putman? No, Your Honor, this is after HR. After that, they're interacting again. She reports to her supervisor, and this is corroborated by another manager who hears this. Well, I'll explain that. She reports it to Travis Adams, her only manager supervisor at the time. He says, put on your big girl panties and deal with it. This is after the investigation substantiated the harassment. He says, put on your big girl panties and deal with it, and it happens over and over again. Could you help me with a timeline that I can't seem to find and it's bothering me? Yes, Your Honor. So she's had all these incidents. Ultimately, they come in March, and there is some sort of supervisor step in. Okay. At that point, she makes a handwritten statement, right? Yes, Your Honor. And what's the date of that statement? That would have been in mid-March of 2012. March 12th. Yeah. Okay, and then there is a typed statement that follows that. Yes, Your Honor. And when is that made? That is made, she doesn't know she didn't make it, but it would have been made during the investigation. She signed it? I believe so. It was March 2012. So it's also March? Yes. And then her deposition is taken when? I think it's taken in 2014. Yes, Your Honor. Does that sound right? Yeah, that sounds right. Okay. I've read through every line of the deposition that is in the JA, and I have been with witnesses when they've had, and you knew what this statement said, right? Yes, Your Honor. So you had this statement. I couldn't find you coming out in the, asking her questions in the deposition that would support any of you directly dealing with the, I'm familiar with the incidents, I'm familiar with the things that are in your brief, but those are questions that were asked by that side. Then you had an opportunity, and as I read the materials in front of us, you asked your client questions. Is that right? Yes, Your Honor. And when you asked your client questions, did you ask her to harmonize all of these various statements that she was making? I don't believe so. It's not in there, Your Honor. So it seems to me if you had maybe, you could construe what you're saying now, which is what she was really talking about in those written statements were, I didn't make a formal request, didn't file the, but I made all of these many, many, many informal requests, and they're sufficient. But she never rounds that corner in any of her testimony, does she? I disagree with that, Your Honor. Okay. And her declaration that went with the summary judgment brief, which is also an error, Your Honor, because the trial court did not consider it. When was that made? That was made at the time of summary judgment, so it would have been in 2015. So, but what I'm trying to do is to tell you that what she had a problem with was the 2012 statements. And they sat there for a long time without any of this gloss that you would have, which may be true. I mean, I think this sounds like a sympathetic plaintiff, but she did say those things in 2012. I mean, I don't think that she had to file a formal statement. I don't think it matters that they, it's good for the employer that they have a policy, but I think that if she had made to her supervisors the complaints that she said she made, then maybe she, there would be a dispute of material fact here. But you can't create it in those written, beginning written statements in 2012. She didn't say anything about that. Your Honor, I think I understand. You know my problem, so now tell me what's the problem. I think under the applicable legal standards, there's enough to get by summary judgment. I also think ignoring the declaration is error. She does clarify there, and I know the timing isn't perfect. I'm not arguing that. So what's your best case, factually, closest to this, where you have this asserted dispute by the plaintiff with her own claim? Well, she says that it was about reporting. No, no, no, the best precedent that you would look to. You would say this is just like X, and that court said that there was a dispute as to material fact. Your Honor, I think in the Freeman case, which is cited in the brief, where we're talking about, again, we're talking about co-workers, negligent standards. I think in the Carson-Giant case, which was affirmed by this court. And I will certainly read both of those. You understand the question I have. So if they are directed, in your view, to this question, where the plaintiff herself is making conflicting statements. See, I haven't found a case like this. Your Honor, I see my time is running. Can I address that? Answer the question. Your Honor, she strongly contends that she's making a, contradicting herself. Again, it's because complaints means complaints to HR. She even talks about, like, other managers. Another co-worker, at the time of the investigation in March, says, I said to her, why haven't you reported this yet to your supervisor? And she said, I did. So I think there's enough there, there she gets the inference. But the difficulty is those 2012 statements to which my colleague refers, they're fairly detailed. I mean, the record has a lot of statements as to why she didn't come forward. And, you know, it has to do, I didn't want to cause trouble. I knew he was going to have twins. I knew he was the sole support for the family. And they may be laudable. But when you have those statements as to why I didn't do something that would put the company on notice, that's problematic. I understand, Your Honor. Again, that would be about giving notice to HR.  Not only did I know I didn't report, but there are reasons. Three different reasons. Three different related reasons. Yes, Your Honor. Why I didn't report. That, you know, they may be laudable, but they can't, they don't put the company on notice for responding at Superior. That's the problem. Again, Your Honor, she wanted, for those laudable reasons, she wanted HR to move him away from her. Not HR, her supervisors. That's what she's talking about. That's what the testimony is. And that wasn't considered at the lower court. And we'd argue that's it. Let's have you take this up on rebuttal, okay? Okay, thank you. How big an operation is this? I'm sorry? How big an operation is this? How many employees are we talking about? Gaston County itself. No, or in her shop. I don't believe there's anything in the record, Your Honor. But I think it would show that there's... Do you know the answer? It's between 50 and 100. 50 and 100 employees. And how many people do what she did? 90 percent. Is she still employed there? She is not, by her own choosing. The deposition testimony, I'm not sure that's part of what we've brought to you, but she left when her driving record cleared up, got another job. Your contention is that that was due to the speeding tickets? Yes, Your Honor. She actually testified that once her driving record cleared up, she was able to get another position in another EMT closer to home. She was traveling about an hour from Rutherfordton down to Gastonia. Your Honor's saying that she wasn't... She had the three speeding tickets, but that didn't... These are other speeding posts. Isn't that right? Pre-incident. Well, they have... They're pre-incident, but then there's... I thought they were speeding tickets after this all goes... No? There was one... I thought you said that's why she left. No, she left once her speeding tickets cleared up. They... When they posted on her record, they lasted for several years. And there was one subsequent, but her... She was never able to drive. She couldn't drive the emergency... As I understand it, she couldn't drive the emergency vehicle because... The... Her license wasn't revoked, as I understand it. But it was a problem with the insurance. Correct, Your Honor. But for one reason or another, either because... Even though the license was revoked, you're saying, well... As a general matter, we weren't retaliating against... If she says all these examples of retaliation for FMLA leave and all things, you're saying we're not... We're not retaliating against the insurance policy. Or wouldn't allow her to drive. That's correct, Your Honor. She was terminated in the fall of 2010. She had been an employee for about five months at that time. And they discovered her driving record where she had had one or two tickets prior to her beginning employment. And then a third that is what kicked her into that insurance default problem. And they discovered that in September of 2010 and decided to dismiss her because they could... She could not... All she could do was be in the back of the truck and her partner would always have to be the driver. Always. Whoever she was partnered with would always have to drive and never be the care provider. And they were concerned that that was a difficulty with the quality of care. That for a 12-hour shift is always one paramedic who's with the patient. And they informed her of this and dismissed her early October. It coincided, coincidentally, with her reporting to... I use the term supervisor, although not in the legal sense. Under Vance, a supervisor that she was having a medical issue that she would need help with. And he said, we'll fill out an FMLA form. Well, a couple of days later, supervisory staff, the ones who have the right to fire and discharged, discharged her without that knowledge. All that being said, within a week, she was reinstated once she made a complaint about that. She was reinstated with full pay, with full benefits as well. This all precedes, well precedes. More than a year before, yes. And she has acknowledged in her deposition that she does not believe that the harassment that Putnam, her co-worker, was giving her was in any way instituted by the county. So that's not the issue at all there. Okay. So I think y'all have pretty well covered the conflicting statement concern. You aren't really seriously making the claim that just because your client had a complaint policy, that you had to file a written complaint under that policy in order to have a viable claim, are you? Not at all, Your Honor. But it was not until she made the formal complaint. We can't argue about the facts of this case. But as she had told, as she says she has now, as she had told supervisors along the way of this really dreadful conduct by a fellow employer, she would have made out a case, even though she hadn't filed a written complaint. Intolerable circumstances, behavior that would not have been sustained, that would not, that the employer would not have stood for, that they would have dealt with that. I understand your submission that they would have dealt with it. But what I'm really getting to is asking you if in your view it's necessary to file a written complaint in compliance with your procedure in order to make the employer knowledgeable about it. No, Your Honor. Okay. You don't need to go that far. No. No. We don't need to go that far. Well, what she's acknowledged, I mean, obviously you're very familiar with her statements, both of which she prepared. And it's clear on looking at the statements that she's the one who authored both of those in the first week of March of 2012 that she didn't tell anybody, why she didn't tell anybody. She didn't tell anybody, that she only told her co-workers and she should have gone a step further. But going through the evidence and the record, you see it deplete with information from all the co-workers saying, or several of them, we told you to complain and you chose not to and we stood beside you in that decision. And we chose not to complain either on your behalf, although that's, you know, in a perfect world, that's what we would all have hoped had happened. Let me ask you about that, because we are at summary judgment. This is not, there was not the benefit of a full trial. And so we're required to accept every inference, reasonable inference in favor of the plaintiff in this case, if supported by the evidence. And I certainly understand your theory of this case, that the fact that this particular plaintiff made some statements which could be interpreted as being contradictory with respect to whether or not she reported the matter to supervisors could be read that way. But why wouldn't another reasonable reading of this testimony be that the plaintiff in this case was making a distinction between her direct supervisors and HR, an entirely different department of the organization? I think a lot of people would assume, would find that to be reasonable, that when she said she wasn't, she hadn't reported the matter, that she was in fact talking about reporting the matter to HR, which would elevate, in her mind, the complaint to something entirely different. Your Honor, I think it's the window into her mind. In fact, she said that. She says, I acknowledge that I probably should have made a bigger effort to report this problem to human resources, but I was truly trying not to rock the boat. Right. She says that. There are several pages in both of her statements which are part of the supplemental appendix. Frequently, she goes paragraph by paragraph and then returns to it later in her nine-page handwritten statement, and then several times in her type statement where she says, I did not report this to anyone and gives the reasons. Not to anyone except my coworkers. At no point does she say, I told Travis Adams, my lieutenant, or I told my captain, Jamie McConnell, she does say four days before she prepared this statement, on February 28th of 2012, she told Billy Mitchell that as they were working, and he was a captain, but not a supervisor in the legal sense under Vance, that she did not want to be partnered with Putnam because they were getting ready to do some shift changes. She said, I don't want to be partnered with him, and he said, fine. Of course, that didn't happen. Her testimony in the deposition is several times, she says, I told them generally. I told them in generalized terms. I told them I didn't want to be partnered with him. I didn't want to be around him. Assuming that that's true and consistent with her indication that she told nobody about the specifics of these incidents, that's still, it's appropriate that what the county did at that stage when she said, I don't want to be partnered with him, they didn't partner with him, her, with him. And this is all in December, January, and I don't believe there were any complaints in February except at the end of the month with Billy Mitchell. So there was a December complaint and there was a January complaint. Everything else is very foggy. Yes, I'm sure they saw what was going on. I think your answer may have given some light to the other side because are you saying that the company did respond to her complaint in December and decided not to partner her with this guy? No, and if I may go past my time to answer. You told me that one minute ago. Yes, we're saying even if we took her contradictory testimony, it's true that she reported something. She was never partnered with him except once in October before any incidents happened, and he was never scheduled to be her regular partner. In February of 2012, four days before the incident that led to the actual report to HR, she did make that complaint. Do not partner me with, do not partner us together. But in her deposition testimony, she says from time to time I didn't want to be partnered with him. And she never was. I'm just saying she never was. So it's whether that was in response to a request from her, and we have no evidence that that was the case. Well, there's a question of why she didn't want to partner with him. She did not articulate that. That's the point. That is the point. There can be a hundred reasons why one person wouldn't want to partner with another person, just because some people are jerks, and they're irritable, and the personal chemistry is bad. You used the phrase aggravating at one point. Yeah, I mean, there's lots of situations where people don't get along with one another, and there are times people that in the very first couple of days I was in college, I said, I don't want to be with this roommate. I didn't, you know, a multitude of reasons for why. And the public policy you referenced earlier in the arguments is very important that the county cannot micromanage everything that's going on with employees. This is not a, this wasn't a bad actor. I mean, the county did have the policy. They sent him to counseling. They did have a reporting policy. They did circulate it. They did take remedial steps. I mean, they're not a bad actor on this whole business. And the question is, do you really want to string up on respondeat superior with the very serious notice problem? Someone who without notice, you know, as far as I can see, is trying to do the right thing. Ms. Thompson, did I understand you to say that Ms. Wilson did not report the specifics of her abuse to her supervisors? Is that what you're saying? I am saying that, first of all, for three reasons. One, her statements indicate affirmatively. There's evidence in the record that she was pretty specific about what it was that Mr. Putnam allegedly had done to her. Her deposition testimony is that she made generalized statements, that she referenced that he was sending her texts. What about the text messages showing genitals, the groping? She only says that she talked to her co-workers about those, that she did reference the texts to Jamie McConnell, who was a captain at the time. But again, none of them meet the definition of supervisor under Vance to hold. And we ask you to extend Vance to the county. Page 12 says that Ms. Wilson told McConnell about the bruises, about the groping, about the two incidences where he left bruises on me. She told that to Adams, again, pleaded with Adams to get her off Putnam's truck because he had sent her pictures of his genitals. That's not the report? Your argument rests on your contention that those two people are not supervisors? Because I have not understood that, if that's what your argument is. That's part of my argument. My other argument, yes. Well, would you have any other argument? Yes, that one, she reported nothing, or she's provided contradictory information as to whether she reported anything. That might be the better one to rely on. Yes, and then thirdly, that her reports, if she is to believe, were so generalized that they were not specific as required under recent case law, including Freeman, which was very specific and explicit about what was going on, regardless, then that was the third party. Her account of what happened in her deposition is certainly specific enough, at least in my view, to prevent the grant of summary judgment against her, unless she did not communicate to her employer. But saying that these two people that have, are not employers, I had not understood that was your, were not representatives of the employer. Because I don't, if your argument hinges on whether they're supervisors or not, I think this is a much more difficult case for you. So if you have some other argument, I thought your argument was that she did not communicate that to them. It is my argument that she communicated nothing to anybody except co-workers, and nothing was known or should have been known by the county, the supervisors. The language that my colleague was quoting to you is her deposition testimony that is in, you say, in conflict with these statements. Yes, Your Honor. So it's, it's deposition testimony taken two years, three years after the fact. Yes, and during the same deposition, she said that everything was accurate and true in both of the statements that she prepared two years earlier. How did it come to be that these statements were created? They were created with respect to the HR investigation in early March. What was she told to do in these statements? To memorialize the events and why she didn't report it? Explain why she didn't report it. So she was told to tell why she didn't report it to HR? HR was asked, asked her, why, why didn't you report it? It's interesting because she... But just, were they asking, why didn't you report it to HR? No. Why was this not reported, period? Why was this not reported to anybody? There's somewhere in this record that tells us what the, what the question was, what the form was to her. I mean, this, this didn't just come out of, first of all, it's page two, so we know it didn't, it doesn't begin there, but there must have been some request of her. Right? Put together what happened. And, and her type statement is dated. Well, that's a little different than what you just said to me. The March 4th type statement that she prepared. Yes. It's clear from when you start reading that, that she says she's putting down everything that she can remember about, about the events, and she explains why she didn't report it. Why she wrote that, in response to what? All we know is that she knew there was an HR investigation beginning, and she provides that to HR in addition to preparing her handwritten statement. Do you regularly represent Gaskin County? I do. And so, have you seen what HR asks of employees that the handwritten statement would be a response to? Yes. Describe. What does it say? Something along the lines, I don't have the exact wording, Your Honor. Something along the lines of describe the, the incident complained of, and it has the, the three quarters of the page is background information about who the employee is, the date of the incidents complained of, and, and then describe, describe in your own words what happened. Did it say how, why you didn't report it to HR? No. There was, there was a verbal exchange. I think Amia Massey discusses that in her deposition. I'm sorry. There's a verbal exchange about what? About why was this not reported, or a discussion. You asked that in deposition. Is that what you're saying? We. I don't understand what you're saying. Amia Massey was in HR. Was she verbally told when she filled this out that she was to do that, or was she, did you ask her that question in deposition, or both? Your Honor, I need to back off. I'm not sure. Okay. All right. Any more questions? Thank you. Co-counsel. Counsel, we've given your co-counsel an awful lot of time. So, if you have some new arguments to make. I, I do not. I was going to say let's therefore. Well, maybe you have a response to the last question, do you? Pardon me? Do I know what was said as to get her to make the statement? Yes. It is my understanding that after the altercation between Mr. Putman and Mr. Phil Parker, Jamie McConnell, as the captain, came out and says, what's going on here? He tells Abby, you need to go and start, you know, telling us what you know. She was reluctant. He said, we're going to get HR in here. You need to tell us what's going on between you and Jim Putman. Beyond that, I don't know. I don't know exactly. Thank you, sir. Thank you. Thank you. And you have some rebuttal time. Does your client maintain that HR asked her why she hadn't reported this earlier? I don't, Your Honor.  Yeah. Mr. Herman, what concerns me is that, you know, you've got these 2012 statements, and they give fairly detailed reasons for not reporting. And then as litigation proceeds or becomes more imminent, you begin to recognize those statements, however laudable they might be, are going to be very problematic for your case. And then, so litigants try to clean up with subsequent testimony or deposition testimony, problematic elements in their case. But to go back to a comment that was made early on in the argument, if we allow those things to create an issue of material fact on summary judgment, then I'm wondering whether we're kind of encouraging a sort of gamesmanship with the litigation process where people make a statement, it turns out when a lawyer looks at it or reflects on it, it's problematic. So you want to put a different spin on it or what have you. And that's what is troubling. I understand your concern, Your Honor. And the first way I'll address that is on the Title VII sexual harassment and other claims, I had to go through the EEOC. Within 180 days of the bad act happening. So the notion that it first was changed later to make things better, that doesn't quite hold up because, I mean, this has been what you said from the beginning. And the second point on that is I do agree with the holding in Halperin that they cite. I don't think that's a bad holding. I don't think we want that reality. But the fact is that is about an affidavit created to contradict. This is a woman in her 20s, sexually harassed at work, put in a meeting, told to create a statement, and trying to be held to that later in a deposition years later. That's wildly different. That's not under oath. Now, in her deposition, she said, yeah, I mean, sure, I did that. That's fine. And the way that she explained it was just talking about HR. I asked if it was true and accurate. She did, in her explanation. And we're making a credibility determination. It would be the argument. Well, I would find her credible. I mean, what's the... Sure. Does she, in these statements, at all mention Travis Adams or James McConnell? In these, you know, either the typewritten or... I mean, I can find out something that you knew. Yeah, I don't believe so, Your Honor. And again, I don't know what's on the first page. Like, her testimony was actually that this stuff very well could be on that missing page that we asked for in discovery, the first page of her written statement, which was used to create the type statement. We don't know what's on the first page. When she was asked about it, she said, yeah, this stuff is probably there. We asked for it in discovery, going way back. Why would all the discussion of Travis Adams and James McConnell be on the first page when this seems to be done chronologically? And even according to her later account, they don't come in until the story's underway. Your Honor, I don't know the specific answer to that. I think it would be an inference against her to determine that. The last thing I'll say, Your Honor, Your Honors, is that even putting her aside, we have prior complaint, a prior complaint, two prior complaints, one specific about an incident that's eerily similar to what happened to her. Eerily similar. They didn't punish him. Second, after HR, he's hitting her again, calling her a bitch at work, and no one's talking about it. She complains to tell her to put on her big girl pants and deal with it. The court didn't. They addressed it in the facts section when they ruled on the other claims. Not there, Your Honor. That's a violation. They were, there's no argument about notice there. So with that, Your Honor, plaintiff's appellant would ask you to reverse the trial court and remand for trial. Thank you. Thank you. We will adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Albert Diaz